DREW, J.
 

 |,In this workers’ compensation matter, the Bossier Parish School Board (“Board”) appeals a judgment ordering the reinstatement of wage benefits, the payment of attorney fees, and the assessment of a penalty.
 

 We affirm.
 

 FACTS
 

 Curtis Johnson was employed as a janitor at Plain Dealing Elementary School. He begin working there in 1984 when he retired from the Army after 26 years of service. On July 13, 1999, Johnson was riding on a lawn tractor mowing the grass at the school when the tractor struck a large hole, causing his abdomen to strike the steering wheel and aggravating a preexisting abdominal hernia. According to the physician who examined Johnson for a utilization review, the trauma caused a hematoma and probably led to the formation of fistulas.
 

 Johnson went home, returned to work the next day, and was told to go back home because of a bad abdominal bruise. After seeking medical treatment, he subsequently underwent several surgeries for the placement of mesh to close the abdominal incision, and to deal with infections associated with the mesh.
 

 Johnson returned to work and was helped by others to do his job. He retired in June of 2001 because he was no longer able to do his job and because of the risks associated with his hernia.
 

 The Board initially disputed that Johnson’s condition had been caused by the accident. However, in November of 2002, the parties reached 12a settlement in which the Board agreed to pay $34,318.17 to Johnson in past compensation benefits, attorney fees, and penalties.
 

 The Board is self-insured. A claim abstract from Hospital Services of Louisiana, Inc. (“HSLI”), the third-party claims administrator for the Board, reflects that Johnson received:
 

 • A temporary total disability (“TTD”) payment of $863.20 for November of 2002.
 

 • Monthly “wage loss” payments of $863.20 from December of 2002 to September of 2003.
 

 • Monthly TTD payments of $863.20 from October of 2003 to March of 2005.
 

 On April 15, 2005, Linda Hollingsworth, an adjuster for HSLI, wrote to Johnson’s counsel that because Johnson returned to work but then retired in 2001, his benefits were to be changed to Supplemental Earnings Benefits (“SEB”). Johnson asserted that this move was arbitrary and capricious and the current litigation ensued. HSLI’s claim abstract shows that Johnson received monthly “wage loss” payments of $863.20 from April 2005 to October 2005 and a monthly “SEB Adjustment” of $863.20 from November 2005 to May 2007.
 

 On April 20, 2007, counsel for the Board wrote to Johnson’s counsel that SEB should have terminated on March 31, 2007, as that totaled 104 weeks of payment. Counsel further wrote that SEB would continue to be paid under protest. Nevertheless, these payments were stopped the next month.
 
 [1]
 

 | ^Following a trial on the merits, the WCJ ruled in Johnson’s favor. The WCJ concluded that: Johnson’s decision to re
 
 *583
 
 tire was entirely for medical reasons; he had been rendered permanently and totally disabled by the July 1999 accident; and the Board acted arbitrarily and capriciously in changing Johnson’s disability from TTD to SEB, and then terminating SEB. The Board was ordered to reinstate wage benefits of $862.00 retroactively beginning with the June 2007 payment but excluding the August 2007 payment. The Board was assessed a penalty of $2,000.00 and ordered to pay attorney fees of $3,500.00.
 

 DISCUSSION
 

 Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review.
 
 Banks v. Industrial Roofing & Sheet Metal Works, Inc.,
 
 96-2840 (La.7/1/97), 696 So.2d 551. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one.
 
 Id.
 
 When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own inferences and evaluations are as reasonable.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989);
 
 Arceneaux v. Domingue,
 
 365 So.2d 1330 (La.1978). Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Stobart v. State through Dept. of Transp. and Development,
 
 617 So.2d 880 (La.1993).
 

 14Level of Disability
 

 The Board first argues on appeal that the WCJ erred in finding that Johnson had been permanently and totally disabled by the 1999 accident.
 

 The relevant provisions regarding permanent total disability are found in La. R.S. 23:1221(2), which states:
 

 (a) For any injury producing permanent total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, and experience, sixty-six and two-thirds percent of wages during the period of such disability.
 

 * * * * *
 

 (c) For purposes of Subparagraph (2)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subpar-agraph (2)(b) of this Paragraph, compensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
 

 Johnson’s duties as janitor included maintaining the outside of the school and keeping one building clean. He mowed the grass, cut hedges, and trimmed weeds. This yard work, which Johnson described as heavy duty, would be done two to three days a week during the spring and summer. He cleaned the building by emptying the trash cans, mopping and sweeping
 
 *584
 
 on a daily basis, and waxing the floors twice a week. His job required him to lift objects, as well as to stoop and bend regularly.
 

 | r,Johnson had no problems doing his job before the accident. Two student workers would help him after school, but he did not need anyone to physically help him perform his job. Johnson also said that his high blood pressure and diabetes did not keep him from doing his job prior to the accident.
 

 Johnson was unable to physically perform his job when he returned to work after the accident. He was limited to light-duty work, but according to Sara Perkins, the head custodian at Plain Dealing Elementary, the school did not have light-duty work for him to do, so accommodations were made. Student workers helped Johnson in the afternoon, and Perkins’ husband was paid out of the school’s benevolent fund to do the heavy work for Johnson.
 

 Johnson was basically allowed to do little more than push a broom. In addition, Johnson was allowed to return home once in the morning and once in the afternoon in order to bathe and to have his bandages changed.
 

 Johnson believed that if he continued working even with the accommodations, he risked a dangerous situation involving his hernia, and this belief was not unfounded.
 

 Dr. Michael Banda first met Johnson in 2000 when he was being treated by Dr. John Austin. Dr. Banda assisted Dr. Austin in a surgery to remove a small intestinal fistula caused by erosion of the small intestine into the mesh.
 

 Dr. Banda began treating Johnson in January of 2001 after Dr. Austin retired. He performed surgery that year on Johnson because an abscess had formed over the prior wound site. Dr. Banda wrote in October of 2001 that | Bthe mesh used in the hernia repair had become infected, and that Johnson had been unable to return to work because of his open wounds and was currently being treated for those wounds. The infections associated with the mesh were a recurring problem.
 

 In September of 2002, Dr. Banda wrote that several surgeries had been performed on Johnson to drain and debride abscesses associated with the mesh. The mesh was completely removed in January of 2002 and was not replaced because of his history of infections associated with the mesh. Johnson was left with a very large anterior abdominal wall hernia, meaning there was only a thin layer of skin and tissue over his abdominal organs. Dr. Banda believed that this condition prevented him from returning to his pre-accident employment as a janitor. Dr. Banda wrote that activities such as stooping, bending, lifting, climbing, and operating machinery would be painful as well as dangerous. Dr. Banda thought that although Johnson’s condition was permanent, Johnson could work in a job limited to sitting and work of a clerical nature. Dr. Banda considered Johnson to be permanently disabled from a functional/physical standpoint. In a December 2005 letter, Dr. Banda again wrote that from a functional/physical standpoint, he considered Johnson to be permanently disabled.
 

 Dr. Banda was deposed in 2007. He explained that when he wrote in 2005 that Johnson was disabled, he was specifically referring to janitorial work. The statement of disability in the 2002 letter was in reference to employment in general. Johnson’s medical condition had not changed between 2002 and 2005.
 

 |7Pr. Banda recognized the precariousness of Johnson’s hernia. He explained that Johnson’s intestines are basically outside the abdominal cavity and are protected by one layer of skin, which presents the
 
 *585
 
 risk of devastating consequences from something as minor as a little poke. At the time of his deposition, Dr. Banda thought that Johnson was fully disabled and should not be in the work force.
 

 Dr. Banda recommended that Johnson stoop no longer than necessary to pick up a newspaper, bend no longer than necessary to remove a shoe or grab a chair, and lift no more than a plate of food. He thought Johnson would become uncomfortable after sitting in one position for more than 30 minutes or standing for more than 5-10 minutes.
 

 Johnson was approximately 64 years old at the time he retired. He has never had secretarial or clerical training. No training for any different job was offered to him. He was never subjected to a Functional Capacity Evaluation, and he has never been referred to a vocational counselor.
 

 It appears from the record that Johnson was well liked by his coworkers at Plain Dealing Elementary, and they did all they could to help him maintain his job for as long as possible. They apparently wanted Johnson to feel useful in spite of his serious injury, as he was even told that although there was no light duty work for him to do, he was still needed at the school to keep the students in line because they respected him as a retired veteran.
 

 | ¡¿Based upon this record, we cannot conclude that the WCJ was clearly wrong in finding that Johnson was permanently and totally disabled as a result of the 1999 accident.
 

 Retirement
 

 The Board next argues that the WCJ erred in finding that Johnson retired for medical reasons. The Board asserts that Johnson voluntarily left the work force after he completed the Deferred Retirement Option Program (“DROP”).
 

 Frank Rougeau, Director of Finance for the Board, explained that all the workers’ compensation claims by school employees come through his office. Rougeau also explained that an employee actually retires when he enters DROP even though he continues working.
 

 Johnson entered DROP in August of 1997, and would have completed DROP when he retired in June of 2001. The purpose of entering DROP was not to retire but to divert his retirement withholding into a special DROP account and not to the retirement system for a period of three years. Actual retirement is not required at the end of the three-year DROP period, and continued employment is not uncommon, as Rougeau confirmed that numerous employees continue working past the end of the DROP period. Rougeau was never advised that Johnson was retiring because of his medical condition.
 

 Johnson testified that he did not want to retire, but did so on the advice of his doctor. He was going to retire in February of 2001, as advised by Dr. Banda, but the school’s principal wanted him to wait until the end of Rthe school year. Although Johnson had heart valve surgery shortly after he retired, Dr. Banda did not think his heart disease and diabetes were disabling as they predated the accident.
 

 Dr. Banda testified that he was not really aware that Johnson had retired in 2001. However, Dr. Banda agreed that Johnson left the work force because he was medically unable to perform that job. Dr. Ban-da also stated he had no reason not to believe Johnson’s account that after surgery in 2001 he recommended that Johnson retire.
 

 Johnson was placing himself at risk of infection or even death by continuing to work, even with accommodations. He rec
 
 *586
 
 ognized this risk and retired. There was no manifest error in the WCJ’s finding that Johnson’s retirement was medically necessary.
 

 Judicial Confession
 

 The Board contends that the WCJ erred in finding that the 2002 settlement was a judicial confession that Johnson was temporarily and totally disabled. In the oral reasons for judgment, the WCJ noted “a settlement agreement in which there [was] basically a judicial confession that Mr. Johnson is temporarily and totally disabled .... ” The Board argues that there is no admission, indication, and/or stipulation anywhere in the settlement documents as to the type of wage benefits being settled therein. However, the settlement documents cannot be examined in isolation.
 

 What led to the settlement was a dispute over whether Johnson’s injuries had been caused by the accident. According to the joint petition for | l0approval of settlement, the Board agreed to bring Johnson’s “compensation benefits up to date and to pay such benefits prospectively.” The reason the settlement documents cannot be examined in isolation is that the settlement was treated by the Board as applying to benefits for temporary total disability. The Board’s own exhibit, the HSLI claim abstract, gives the settlement the designation of “TEMP TOT DIS.” This is also the same designation used for the payments made on November 20, 2002, and from October 22, 2003, to March 22, 2005.
 

 We find no error in the WCJ treating the settlement as a judicial confession that Johnson was temporarily and totally disabled.
 

 Penalty and Attorney Fees
 

 In its final assignment of error, the Board contends the WCJ erred in awarding attorney fees and assessing a penalty for changing benefits to SEB and then terminating them.
 

 Penalties are
 
 stricti juris
 
 and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay.
 
 Young v. Christus Schumpert Medical Center,
 
 39,593 (La.App.2d Cir.5/11/05), 902 So.2d 1180;
 
 Lee v. Schumperi,
 
 36,733 (La.App.2d Cir.1/29/03), 836 So.2d 1214. Nevertheless, a WCJ has great discretion in awarding or denying penalties and attorney fees.
 
 Nowlin v. Breck Const. Co.,
 
 30,622 (La. App.2d Cir.6/24/98), 715 So.2d 112.
 

 La. R.S. 23:1201(1) states, in part:
 

 Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not|nto exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims.
 

 The phrase “arbitrary and capricious” as used in this context has been defined as follows:
 

 Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation. Stated another way, such behavior arises from unrestrained exercise of the will or personal preference or lacks a predictable pattern.
 

 Brown v. Texas-LA Cartage Inc.,
 
 98-1063 (La.12/01/98), 721 So.2d 885, 890 (citations omitted).
 

 Hollingsworth, the adjuster at the time the benefits were switched to SEB and then terminated, did not testify. She had retired in November of 2007. Patrick Blanchard, a litigation specialist and re
 
 *587
 
 gional operations manager from HSLI, testified, but his personal knowledge of this matter was very limited as he had reviewed the case file only to prepare for testimony about the dates and the amounts of checks sent to Johnson. Blanchard had never spoken with Hollingsworth about the file, or about her basis for changing Johnson’s benefits. Blanchard believed that the basis for Hollingsworth changing the benefits from TTD to SEB was that Johnson had retired on regular retirement status and not on disability retirement status. The April 2005 letter from Hollingsworth to Johnson’s counsel states as much. Blanchard also believed that the reason Hollingsworth terminated SEB was that Johnson had received them in excess of 104 weeks.
 

 112Rougeau discussed with Hollingsworth that Johnson was in DROP and had retired. Hollingsworth would normally make recommendations to the Board about whether or not to pay benefits, and Roug-eau would make the final decision. Roug-eau decided to switch benefits from TTD to SEB, and then to terminate benefits, because Johnson had voluntarily retired.
 

 Johnson retired in 2001. Benefits were switched to SEB four years after Johnson’s retirement. If the retirement was the Board’s motivation, they certainly did not act with much haste. Rougeau could not answer why the TTD benefits were not terminated immediately upon Johnson’s retirement. Rougeau never talked to Johnson, Dr. Austin, Dr. Banda, or Dr. L. Keith Mason, the utilization review physician, before making his decision. In light of this, we cannot conclude the WCJ abused its discretion in assessing a penalty and awarding attorney fees.
 

 CONCLUSION
 

 With the Board to pay appeal costs of $145.50, the judgment is AFFIRMED.
 

 APPLICATION FOR REHEARING
 

 Before WILLIAMS, GASKINS, DREW, MOORE and LOLLEY, JJ.
 

 Rehearing denied.
 

 [1]
 

 . A payment was sent in error in August of 2007.